IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBIE JO WILSON, | ) | CASE NO. 5:17-cv-00814 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Bobbie Jo Wilson ("Plaintiff" or "Wilson")[1] seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Wilson protectively filed an application for Disability Insurance Benefits ("DIB") on

October 8, 2013, and protectively filed an application for Supplemental Security Income ("SSI")

on October 31, 2013.[2]  Tr. 19, 115, 116, 273-274, 275-280, 305.  Wilson alleged a disability

onset date of July 29, 2013.  Tr. 19, 273, 275.  She alleged disability due to neck and back pain

---

[1] During the course of the administrative proceedings, Plaintiff's last name was changed to Wilson.  Tr. 42.

[2] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 4/3/2018).

and spasm, a brain injury, post-traumatic stress disorder, memory issues, depression, anxiety, hand pain and spasms. Tr. 87, 117-118, 151, 163. Wilson's applications were denied initially (Tr. 151-156) and upon reconsideration by the state agency (Tr. 163-174). Thereafter, she requested an administrative hearing. Tr. 177-185. On November 18, 2015, Administrative Law Judge Joseph G. Hajjar ("ALJ") conducted an administrative hearing. Tr. 76-86. During the November 18, 2015, hearing, Wilson's attorney informed the ALJ that Wilson's physician had ordered a lumbar MRI but it had not yet been scheduled because she was waiting on insurance authorization. Tr. 80, 84. The ALJ agreed to reschedule the hearing to another date so that the MRI results could be part of the record. Tr. 84-85. That next hearing was held on January 20, 2016. Tr. 36-75. At the January hearing, Wilson's attorney informed the ALJ that Wilson had not had the MRI because her insurance company would not authorize it until Wilson had received six weeks of physical therapy. Tr. 39. The ALJ indicated he would proceed with the evidence that they had. Tr. 39.

In his February 16, 2016, decision (Tr. 16-35), the ALJ determined that Wilson had not been under a disability within the meaning of the Social Security Act from July 29, 2013, through the date of the decision (Tr. 20, 29). Wilson requested review of the ALJ's decision by the Appeals Council. Tr. 15. On March 3, 2017, the Appeals Council denied Wilson's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

Wilson was born in 1981. Tr. 273. At the time of the administrative hearings, Wilson was living in a house with an individual by the name of Kevin. Tr. 42, 83, 82. Wilson

completed school through the 10th grade. Tr. 44. She attended school for part of the 11th grade but did not finish. Tr. 44. Wilson does not have a GED. Tr. 44.

Wilson last worked in March 2013 at the Hampton Inn. Tr. 44. Her position at the Hampton Inn was full time and she worked there for 4-5 months. Tr. 44-45. She worked as a night auditor. Tr. 45. Her duties including checking guests in and out; setting up the continental breakfast; and anything else that needed to be done, e.g., folding laundry. Tr. 45. In 2012, Wilson worked full time at a Super 8 Motel for about 6 or 7 months. Tr. 46, 315. Her work at the Super 8 Motel was similar to the work performed at the Hampton Inn. Tr. 46-47. Also, in 2012, Wilson worked at LaQuinta Inn for about 3-4 months as a housekeeping supervisor. Tr. 47, 315. Wilson supervised approximately 5-8 employees. Tr. 47. She did not have authority to hire employees but she did have authority to fire employees. Tr. 47. While at LaQuinta Inn, Wilson was also a Spanish translator. Tr. 47. In 2011, Wilson worked at Cracker Barrel for about 7-8 months. Tr. 48-49, 315. She also worked at Cracker Barrel in 2007 for 7 ½ months. Tr. 48, 315. While at Cracker Barrel, Wilson was in training for management and she worked as a cashier. Tr. 49-50.

**B.      Medical evidence**

**1.      Treatment history**

On July 29, 2013, Wilson was taken by EMS to TriHeatlh emergency room following a motor vehicle accident. Tr. 411-419. She was hit on the front passenger side of her vehicle while she was traveling through a green light. Tr. 411. She was wearing a seatbelt. Tr. 411. A CT scan of Wilson's cervical spine was unremarkable and chest x-rays were unremarkable. Tr. 413. The final emergency room diagnoses were neck sprain and chest wall pain. Tr. 414.

Wilson was medicated at the emergency room and discharged home with IM Toradol, Vicodin, and Robaxin.  Tr. 414.

Wilson was seen two days later at the West Chester Hospital emergency room with complaints of neck, back and abdominal pain.  Tr. 371-389.  She also complained of burning at the site of an abrasion on her neck.  Tr. 371.  On physical examination, Wilson was noted to have "an impressive seat belt sign across her upper chest and lower abdomen[.]"  Tr. 373.  Wilson's cervical and lumbosacral area was tender to palpation.  Tr. 373.  The balance of Wilson's physical examination was generally unremarkable.  Tr. 373.  Her strength was 5/5 in her upper and lower extremities; her sensation was intact in her upper and lower extremities; and she had pain free range of motion in all four extremities.  Tr. 373.  Wilson's labs were unremarkable.  Tr. 373.  Her symptoms improved significantly with pain medication. Tr. 373.  A CT scan of the abdomen and pelvis showed no acute traumatic abnormality.  Tr. 377-378.  A CT of the lumbar spine showed moderate to severe L5-S1 disc space narrowing, with no fracture or malalignment identified.  Tr. 378.  Wilson's diagnoses at discharge were low back pain, neck pain, motor vehicle accident, abdominal pain, and numbness and tingling.  Tr. 384.  Wilson was prescribed pain medication.  Tr. 384.

Wilson was seen again on August 4, 2013, at the West Chester Hospital emergency room (Tr. 390-401) complaining of continuing chest wall, abdomen, and back pain (Tr. 391).  Wilson was out of pain medication.  Tr. 391.  On physical examination, Wilson exhibited no neurological deficits.  Tr. 391.  She had diffuse lateral back pain with no midline tenderness.  Tr. 391.  There was evidence of a seat belt rash to the left side of Wilson's neck and shoulder and there was bruising to Wilson's right breast and lower abdomen.  Tr. 393.  Wilson had full range of motion in her neck.  Tr. 393.  Wilson rated her pain an 8/10, indicating her pain was worse

with ambulation and movement. Tr. 391. She denied numbness or tingling. Tr. 391. Wilson was prescribed Tramadol (Ultram) and Valium. Tr. 393, 394. She was instructed to take ibuprofen or Tylenol as well as Ultram for breakthrough pain. Tr. 393. Wilson was advised to follow up with her primary care physician and possibly a spine specialist for further management of her back pain. Tr. 391, 393. Wilson indicated she did not have a primary care physician but she was working with her insurance to establish a primary care relationship. Tr. 393. Wilson's diagnoses at discharge were low back pain, abdominal wall contusions, and chest wall contusion. Tr. 394, 396.

On August 13, 2013, Wilson started seeing James T. Lutz, M.D. Tr. 443-446. Her then current symptoms included constant headaches with associated photophobia, phonophobia, blurry vision, nausea, and vomiting; constant cervical pain, with intermittent daily pain, numbness, and tingling radiating into her arms and down into her hands and fingers; constant thoracic pain, with intermittent daily pain, numbness, and tingling wrapping around bilaterally to the sternum and through the chest; constant low back pain, with intermittent daily pain, numbness and tingling radiating down both legs and into her feet and toes; constant chest wall and sternal pain, radiating into her left shoulder, right breast, and lower ribs; and constant abdominal pain, described as sharp and stabbing pain. Tr. 443-444. Wilson also complained of severe anxiety, fear of going outside, and fear of being in a car. Tr. 444. Wilson noted a history of anxiety with significant personal stressors. Tr. 444. She reported seeking treatment for her mental health issues two years prior but she had not had symptoms over the prior year and her anxiety had been well controlled. Tr. 444. Dr. Lutz diagnosed posttraumatic concussion syndrome, cervical sprain, thoracic sprain, lumbar sprain, chest wall contusion, abdominal wall contusion, and anxiety. Tr. 445-446. Dr. Lutz prescribed Percocet and Baclofen. Tr. 446. Dr.

Lutz felt that Wilson could benefit from physical therapy and he referred her to Dr. Buchanan, a chiropractor, for evaluation. Tr. 446. Dr. Lutz also referred Wilson to Dr. Oleski for a psychological evaluation. Tr. 446.

On August 17, 2013, Wilson saw Dr. Buchanan for an evaluation. Tr. 586-587. Wilson reported suffering from intense neck pain, mid-back pain, low back pain, headaches, and chest pain since her accident. Tr. 586. She indicated that her headaches were severe and she was having memory problems. Tr. 586. She reported having difficulty walking and balance problems and she was having intense spasm in her neck and low back. Tr. 586. Wilson was having difficulty with almost all her activities of daily living due to her symptoms. Tr. 586. Wilson denied having similar symptoms prior to her accident on July 29, 2013. Tr. 586. Dr. Buchanan noted some abnormal objective findings, including a positive Spurling's Test that referred pain into both shoulder blades and a positive straight leg raise exam at 40° on the right. Tr. 587. Dr. Buchanan diagnosed cervical sprain, lumbar sprain, thoracic sprain, and post-traumatic headaches. Tr. 587. He recommended that Wilson continue to see Dr. Lutz for medical management and that she receive therapy through Dr. Buchanan's rehab department with goals of improving strength and flexibility and reducing pain. Tr. 587. Dr. Buchanan indicated that, if Wilson did not progress as expected, she would need MRIs of her neck and/or low back and possibly a CT scan of her head due to the intensity of her headaches. Tr. 587.

Wilson saw Stephanie Quehl, CMP, in Dr. Lutz's office on September 10, 2013. Tr. 447-449. Wilson reported some worsening of her symptoms since her last visit. Tr. 447. She also reported that she had slipped and fallen in her bathtub because she was hurrying. Tr. 447. She hit the back her head – her pupils were different sizes and she was "seeing stars" but she did not go to the hospital. Tr. 447. Wilson relayed that she had been having problems with her memory

since the accident, especially with dates. Tr. 447. She reported that her medication was not making her dizzy. Tr. 447. Wilson was in therapy with Dr. Buchanan three days per week and she was seeing Dr. Oeleski. Tr. 447. Wilson was using a cane. Tr. 447. Wilson was continuing to take Percocet and Baclofen with some relief of her symptoms and no side effects. Tr. 447. Wilson was also taking ibuprofen (600 mg), three to four times per day. Tr. 447. In consultation with Dr. Lutz, Nurse Quehl recommended MRIs of the cervical, thoracic and lumbar regions due to the radicular symptoms that Wilson was continuing to experience. Tr. 449. Also, Nurse Quehl increased Wilson's Percocet. Tr. 449.

On September 14, 2013, MRIs of Wilson's cervical, thoracic and lumbar regions were performed. Tr. 419-425. The cervical MRI showed a small right paracentral disc protrusion at the C5-6 level, abutting the right C6 nerve root, without evidence of significant central spinal stenosis. Tr. 419-420. There was no evidence of an acute fracture. Tr. 420. The lumbar spine MRI showed small broad-based central disc protrusion at the L5-S1 level with an annular tear, with no significant central spinal stenosis or nerve root impingement noted throughout the lumbar spine and no evidence of an acute fracture. Tr. 422. The thoracic spine MRI showed a small left paracentral spur formation at the T8-T9 disc level, without significant central spinal stenosis or nerve root impingement and no evidence of an acute fracture or subluxation. Tr. 424.

Wilson saw Dr. Lutz on October 9, 2013. Tr. 450-452. Wilson indicated that her symptoms were continuing to worsen. Tr. 450. She was continuing therapy with Dr. Buchanan but was no longer seeing Dr. Oleski because Dr. Oleski's office put treatment on hold. Tr. 450. Wilson was continuing to take Percocet and Baclofen with some relief of her symptoms and no side effects. Tr. 450. Wilson was also taking ibuprofen (600 mg) and extra strength Tylenol as needed. Tr. 450. Dr. Lutz noted that Wilson entered the examination room with a stiffened gait

and a forward lean using a cane.  Tr. 451.  On examination, Dr. Lutz observed some abnormal findings, including marked tenderness with spasm throughout the entire paraspinal and lateral cervical regions, worse on the right; gross sensation revealed a sensation of coldness, tingling and numbness bilaterally in both arms down into the hands and fingers; tenderness with spasm over the entire lower lumbar and upper sacral regions bilaterally; gross sensation revealed coldness, tingling and numbness bilaterally in both legs into the feet and toes; bilateral chest wall and lower rib tenderness to palpation; and generalized tenderness was present to palpation in the abdomen.  Tr. 451.  Dr. Lutz continued Wilson on Percocet and increased her dosage of Baclofen.  Tr. 451-452.  Dr. Lutz reviewed the MRI results, noting that the lumbar spine MRI showed an annular tear and disc protrusion.  Tr. 451-452.

On October 10, 2013, Wilson saw Dr. Buchanan for a re-examination.  Tr. 430.  Dr. Buchanan noted that Wilson was still in considerable pain but she was making improvements.  Tr. 430.  Wilson was able to walk better than she was able to three or four weeks prior.  Tr. 430.  Wilson was not as dependent upon her cane as she was three or four weeks prior.  Tr. 430.  She was able to perform some activities of daily living more easily as compared to three or four weeks prior.  Tr. 430.  Also, Wilson's low back and neck spasms were not as intense.  Tr. 430.  Dr. Buchanan recommended that Wilson continue with therapy two times each week.  Tr. 430.

On October 21, 2013, Wilson saw Juan Suarez, M.A., pre-doctoral psychology intern, for a therapy session at Pain Solutions Network.  Tr. 648.  The clinical notes were co-signed by Merritt S. Oleski, M.D., clinical director.  Tr. 648.  Wilson discussed her anxiety, indicating that it increased her chronic pain.  Tr. 648.  Wilson also discussed feeling hopeless, nervous and "lost."  Tr. 648.  The therapist discussed with Wilson the idea of trying to determine what cognitive shifts could be made to make her thoughts more productive.  Tr. 648.  At a follow-up

psychotherapy session with Mr. Suarez on November 4, 2013, Wilson became frustrated.[3]  Tr. 649.  She felt that therapy was not helpful and expressed her feeling that her pain was not in her head.  Tr. 649.  She did acknowledge that emotional stress negatively impacted her physical pain.  Tr. 649.  Wilson opted not to schedule another appointment with Mr. Suarez.  Tr. 649.

On November 6, 2013, Wilson saw Jennifer Haigis, a nurse practitioner in Dr. Lutz's office.  Tr. 505-507.  Wilson reported continued worsening of her symptoms since her last visit.  Tr. 505.  Due to Wilson's complaints of pain, Nurse Haigis increased Wilson's Percocet.  Tr. 507.  Wilson saw Dr. Lutz on December 4, 2013.  Tr. 502-504.  Wilson reported continued worsening pain since her prior visit since she was no longer walking with a cane and was having worse hip and leg pain. Tr. 502.  Her neck pain on the right was worse but she had better range of motion in her neck. Tr. 502.  Wilson had stopped treatment with Dr. Oeleski because she did not feel that it was helping with her anxiety.  Tr. 502.  Wilson remained interested in getting insurance so that she could seek other treatment for her anxiety and insomnia.  Tr. 502.  She had started taking Melatonin (3 mg) with limited response.  Tr. 502.  She was continuing to take Percocet and Baclofen with some relief and no side effects.  Tr. 502.  She was rarely taking ibuprofen and was no longer taking over-the-counter Tylenol.  Tr. 502.

On January 2, 2014, Dr. Buchanan conducted another re-examination.  Tr. 588.  Although Wilson was not asymptomatic and continued to report quite a bit of back and neck pain, Dr. Buchanan felt that Wilson had made improvements.  Tr. 588.  Dr. Buchanan observed that Wilson was noticeably better when compared to 5 months prior and she was not as dependent on her cane.  Tr. 588.  Dr. Buchanan felt that Wilson had plateaued with therapy and he recommended that she be released from therapy to a home exercise program.  Tr. 588.  He

---

[3] The clinical notes were again cosigned by Dr. Oleski.  Tr. 649.

noted that Wilson's prognosis was guarded and she should contact his office if her symptoms worsened.  Tr. 588.

Wilson also saw Dr. Lutz and Nurse Quehl on January 2, 2014.  Tr. 500-502.  It was observed that Wilson's "conditions directly related to the accident of record have reached a state of permanency, with residual effects involving headache, her neck, thoracic and lumbar region, chest wall pain and abdominal pain."  Tr. 502.  Wilson was instructed to wean off of her medication over the next few weeks and follow up with various medical providers, including a neurologist and psychiatrist.  Tr. 502.  Dr. Lutz would recheck Wilson as needed.  Tr. 502.

On January 6, 2014, Wilson saw Jennifer Lager, D.O., at TriHealth Physician Partners to establish a doctor-patient relationship.  Tr. 569-570.  Wilson reported that her range of motion had improved with therapy but her pain may have worsened.  Tr. 569.  Dr. Lager assessed anxiety, lower back pain, cervicalgia, chronic pain, post-concussion syndrome, and post-traumatic stress disorder.  Tr. 570.  Dr. Lager provided Wilson with medication refills but noted that she would ultimately need to see pain management.  Tr. 570.  Dr. Lager provided both a pain management referral and a referral to an orthopedic specialist.  Tr. 570.  Wilson saw Dr. Lager again at the end of January 2014.  Tr. 566-568.  Dr. Lager noted that Wilson was scheduled to see Dr. Knox for pain management.  Tr. 568.  Dr. Lager prescribed a low dose of Cymbalta for her pain and also Ativan for her social anxiety to take as needed.  Tr. 568.

On February 4, 2014, upon Dr. Lager's referral, Wilson saw Dr. Thomas Knox at Integrative Pain Management.  Tr. 622-624.  Wilson complained of pain in her neck, upper back, mid back and lower back.  Tr. 622.   She also complained of pain associated with a herniated cervical disc and herniated thoracic disc, both of which involved some radiation.  Tr. 622.  She described her pain as constant, aching, sharp, shooting, stabbing, and hypersensitive to cold.  Tr.

622.  Wilson indicated her pain was relieved with pain medication.  Tr. 622.  However, she was interested in trying a different medication because she felt that the Percocet was not lasting long enough.  Tr. 622.  On examination, Dr. Knox observed decreased range of motion in Wilson's neck with forward flexion, extension and left rotation.  Tr. 622.  Wilson's gait was normal.  Tr. 622.  Dr. Knox noted tenderness in the low back and bilateral sacroiliac joints and muscle spasms in the back.  Tr. 622-623.  Straight leg raise was negative.  Tr. 623.  Dr. Knox prescribed Oxymorphone, Baclofen, and Percocet.  Tr. 623.  He also ordered injections and physical therapy.  Tr. 623.

Per Dr. Knox's referral, on February 12, 2014, Wilson saw Derek McMurry to start therapy.  Tr. 620-621.  Wilson relayed that she had tried chiropractic treatment and physical therapy in the past for her injuries with no benefit.  Tr. 620.  Mr. McMurry indicated he would need to review Wilson's prior physical therapy records and imaging reports and discuss a plan with Dr. Knox.  Tr. 621.  Mr. McMurry referred Wilson for an EMG/NCS for her upper extremity complaints.  Tr. 621.

On February 20, 2014, Wilson underwent the EMG/NCS testing.  Tr. 546-550.  Ayse L. Lee-Robinson, M.D., provided her findings and interpretations regarding the studies.  Tr. 546-550.  Dr. Lee-Robinson indicated that the testing revealed "abnormal EMG findings in a pattern most consistent with an acute, subacute, right greater than left, most likely multilevel cervical radiculopathy[.]" Tr. 547.  Dr. Lee-Robinson recommended that the findings be correlated with cervical spine imagining studies.  Tr. 547.  Wilson also showed signs of ulnar neuropathy at the elbow.  Tr. 547.  Dr. Lee-Robinson recommended avoidance of compressive forces at the ulnar nerve while resting and avoidance of repeated extension and flexion of the elbow.  Tr. 547.

Wilson continued to see Dr. Lager. Tr. 562, 565. In April 2014, Dr. Lager switched Wilson from Ativan to Valium because the Ativan had worn off too quickly. Tr. 562. Also, in April 2014, Dr. Lager provided Wilson with a referral to psychiatry. Tr. 562. In June 2014, Wilson saw Dr. Lager. Tr. 555-559. Wilson relayed that her pain management doctor told her she might have ovarian cancer. Tr. 555. Wilson had not yet made an appointment with psychiatry. Tr. 555. Wilson was interested in increasing the Valium as well as trying some other medications. Tr. 555. Wilson liked Cymbalta. Tr. 555. Reluctantly, Dr. Lager agreed to increase Wilson's Valium and add phentermine but noted that Wilson needed to see psychiatry. Tr. 558.

Wilson continued treatment with Dr. Knox and Integrative Pain Management through at least June 2014. Tr. 605-619, 719-720. Treatment included medication management as well as steroid injections. Tr. 619, 640-642. Her first injection was administered on February 24, 2014. Tr. 641. On April 7, 2014, Dr. Knox observed that Wilson's low back pain was improving but she was still having persistent neck pain. Tr. 640. Dr. Knox felt that a surgical consult regarding the neck pain may be warranted. Tr. 640. During a follow-up visit on April 11, 2014, Dr. Knox observed swelling in Wilson's foot and three plus pedal edema. Tr. 613. Wilson also had decreased range of neck motion. Tr. 612. Dr. Knox provided a referral for a neurosurgeon. Tr. 613. In May 2014, Wilson continued to have swelling in her foot and three plus pedal edema. Tr. 608. Dr. Knox continued to prescribe Baclofen, Oxymorphone, and Percocet. Tr. 608. In June 2014, Wilson complained that she was having severe spasms affecting the whole right side of her body. Tr. 719. Mr. McMurry recommended a referral to a neurologist. Tr. 720.

Upon Dr. Lager's referral, on June 20, 2014, Wilson was seen at Pledger Ortho Spine for her neck and arm pain. Tr. 708-713. Wilson described the pain as worse in her neck than in her

arms.  Tr. 710.  Wilson reported arm weakness and arm numbness.  Tr. 710.  She reported relief with pain medication.  Tr. 710.  She indicated that her pain interfered with personal grooming, driving, cooking, performing chores, engaging in leisure activities, and sleeping.  Tr. 710. Wilson did not bring her imaging reports to her office visit so she was advised to return in three months when she had her imaging with her.[4]  Tr. 712.

On March 31, 2015, Wilson was treated at Alliance Community Hospital's emergency room after she slipped on a stair and fell forward.  Tr. 763-780.  She complained of neck, back, arm, shoulder, and bilateral knee pain.  Tr. 763.  Wilson also complained of chronic numbness in her left upper extremity.  Tr. 763.  On examination, Wilson's gait was normal and she had normal strength.  Tr. 764.  She exhibited lumbar and thoracic tenderness.  Tr. 764.  She had full range of motion in her neck with paraspinal tenderness.  Tr. 764.  Wilson also had tenderness in her knees, left hand, right elbow and right shoulder.  Tr. 764.  X-rays showed no acute fractures. Tr. 764.  She was treated with pain medication and muscle relaxants and discharged home in stable condition.  Tr. 764.

On May 7, 2015, Wilson saw a new pain management specialist – Marisa Wynne, D.O., at Comprehensive Pain Management Specialists.  Tr. 804-810.  Dr. Wynne noted Wilson's prior pain management treatment with Dr. Knox.  Tr. 807.  Dr. Wynne observed that Wilson had been on a high dose of Oxymorphone but her toxicology reports were consistently negative for Oxymorphone.  Tr. 807.  Dr. Wynne suspected that Wilson was likely discharged by her prior pain management doctor for being negative on her Oxymorphone.  Tr. 807.  Dr. Wynne indicated that Wilson's diffuse pain/neurological complaints were not explained by the pathology on her imaging reports.  Tr. 807.  Dr. Wynne started Wilson on Gabapentin, continued

---

[4] It is not clear whether Wilson returned to Pledger Ortho Spine for further treatment.

Wilson's Duloxetine (Cymbalta), and decreased her Baclofen. Tr. 808. Dr. Wynne referred Wilson for a behavioral health evaluation. Tr. 808, 809. Dr. Wynne ordered a physical therapy evaluation and a TENS unit. Tr. 809. Wilson was interested in a surgical referral but Dr. Wynne suggested that Wilson proceed with seeing a neurologist first because she did not see anything surgical on Wilson's current imaging. Tr. 809. Wilson saw Dr. Wynne again in June and September 2015. Tr. 798-802, 812-817. Dr. Wynne's June 12, 2015, notes reflect that the behavioral health evaluation had been completed in June and that the evaluation indicated that Wilson met the criteria for diagnoses of major depression disorder, mild and social anxiety disorder with panic attacks, rule out personality disorder. Tr. 801. The plan was for Wilson to continue with on-going counseling. Tr. 801. On September 17, 2015, Wilson was contradictory with respect to opioids. Tr. 816. Dr. Wynne indicated that the plan had been to avoid chronic opioid therapy and Wilson had been in agreement with that plan but she was also requesting opioids. Tr. 816. Dr. Wynne released Wilson from her care, noting that it seemed like Wilson was having difficulty having any physician prescribe her opioids. Tr. 815-816. By releasing Wilson from her care, Dr. Wynne indicated that Wilson would no longer be considered in a pain management contract and she could receive treatment that her evaluating physicians deemed appropriate. Tr. 815-816.

On July 28, 2015, Wilson was seen by Andrew Stalker, M.D., at the NeuroCare Center for headaches and memory loss. Tr. 844-847. Dr. Stalker's examination generally revealed normal findings. Tr. 846. Dr. Stalker did observe give away weakness and a gait and station that he described as "slow, mild antalgia." Tr. 846. Dr. Stalker ordered diagnostic testing, including a brain MRI, EEG, and EMG/NCT of her bilateral lower extremities. Tr. 846-847. The diagnostic testing was normal. Tr. 841-843. During a September 29, 2015, visit, Dr. Stalker

observed that Wilson continued to report symptoms without any objectively abnormal findings shown on the EMG, EEG or MRI. Tr. 839. There were no signs of radiculopathy or peripheral neuropathy. Tr. 839. Wilson indicated that she planned to consult with the spine and pain institute. Tr. 839.

Wilson injured her right knee while she was on vacation in 2015. Tr. 860. Wilson had gone into the ocean to save a small child who was in distress and she got caught up in the undertow and her leg went out behind her and she experienced a popping sensation and immediate onset of pain. Tr. 860. Wilson obtained x-rays at a medical center while on vacation. Tr. 860. That medical center diagnosed a strain but recommended that Wilson follow up with an MRI because they thought Wilson could have a possible ACL or MCL tear. Tr. 860. On August 10, 2015, she was seen at Mercy Health Center for follow up and requested an order for an MRI. Tr. 860. Wilson described moderate to severe pain in her right knee. Tr. 860. She had her knee braced and was using crutches. Tr. 860. On August 19, 2015, Wilson was seen again at Mercy Health Center. Tr. 859. She complained of worsening depression and requested a referral to orthopedics for her knee. Tr. 859. Wilson also requested pain medication. Tr. 859. Since Wilson was under the care of pain management, no pain medication was prescribed. Tr. 859. An orthopedic referral was provided. Tr. 859. An MRI was obtained on September 1, 2015. Tr. 857-858. The MRI showed an MCL sprain and small joint effusion. Tr. 857.

In October 2015, Wilson saw Kathleen Hathaway, a nurse practitioner at Mercy Health Center for follow up. Tr. 868-869. Wilson indicated she had been dismissed from pain management and was advised to seek an opinion because pain management was not certain how to proceed. Tr. 869. Nurse Hathaway noted that she would follow up with pain management to verify Wilson's statements. Tr. 869. Wilson reported she was supposed to wear a knee brace for

support due to the MCL "tear" but she was unable to get the brace on due to a lack of strength. Tr. 869. Wilson was using a cane with a limp observed on the right but she had complete mobility and a steady gait. Tr. 869. Nurse Hathaway noted concerns related to Munchausen syndrome and noted that Wilson significantly exaggerated her diagnoses. Tr. 868. During a follow-up visit, Nurse Hathaway noted that records showed inconsistencies between what Wilson had told her office and what was appearing in her records. Tr. 867.

On October 19, 2015, Wilson saw Patrick McIntyre, M.D., of the Spine & Pain Institute for a cervical facet injection. Tr. 878-882. Wilson also saw Dr. McIntyre on November 3, 2015 (Tr. 872-877) and November 17, 2015 (Tr. 884-890). She continued to complain of pain and she was having difficulty walking because of her pain. Tr. 872, 884. During her November 3 visit, she was using a cane. Tr. 872. During her November 17 visit, Wilson complained of jaw, back, neck and arm pain. Tr. 884. Wilson reported that her neck pain was much improved following the cervical facet injection and she reported benefiting from epidural injections for her neck and arm pain a year prior and was interested in receiving another injection. Tr. 884. On examination, Wilson's gait was normal. Tr. 887. On cervical spine range of motion testing, Wilson exhibited pain and she was moderately restricted on flexion, extension and lateral bending. Tr. 887. Her cervical sensation was intact and her upper extremity strength was normal bilaterally. Tr. 887. She had a positive Spurling's cervical examination on the right and left. Tr. 887. Dr. McIntyre scheduled a cervical epidural injection; recommended that Wilson continue with a physical therapy/exercise regimen; provided medications, including tramadol and tizanidine; and advised Wilson to see a dentist for her TMJ complaints. Tr. 888. Dr. McIntyre felt that Wilson was stable and did not feel that a referral for a psychological consultation was needed at that time. Tr. 888.

Wilson continued treatment at the Spine & Pain Clinic in December 2015 (Tr. 931-935) and January 2016 (Tr. 923-929). On December 28, 2015, Wilson received a cervical epidural steroid injection at the C6-7 level. Tr. 931-935. On January 8, 2016, Wilson reported about 60% relief from the cervical injection but indicated that over the prior two days her pain had worsened. Tr. 923. She reported receiving no benefit from lumbar injections she received in November 2015. Tr. 923. A lumbar MRI had been requested but was denied because she had not recently received physical therapy. Tr. 923. On examination, Wilson exhibited active painful range of motion in the cervical and lumbar areas and in her right shoulder. Tr. 926. Wilson's gait was normal. Tr. 926. Her cervical sensation was intact. Tr. 926. Wilson had normal strength in her upper extremities with the exception of her right shoulder. Tr. 927. With the exception of decreased strength in her right ankle/foot, Wilson had normal strength in her lower extremities. Tr. 927. Since Wilson reported relief from her cervical injection, a repeat injection was scheduled. Tr. 927. Wilson was urged to get started on physical therapy so the request for a lumbar MRI could be resubmitted. Tr. 927. Wilson's prescriptions for tramadol and tizanidine were refilled. Tr. 927.

2.    **Opinion evidence**

a.    **Treating providers**

*Dr. Buchanan*

On November 25, 2013, Dr. Buchanan completed a statement in which he indicated that Wilson should be able to perform fine and gross manipulation. Tr. 428. Dr. Buchanan described Wilson's gait as slow and antalgic, favoring the right. Tr. 428. He indicated that Wilson used an ambulatory aid. Tr. 428. Dr. Buchanan indicated that Wilson was progressing with treatment and she should be able to use her extremities for functional tasks. Tr. 428.

*Dr. Lager*

On August 8, 2014, Dr. Lager authored a "To Whom It May Concern" letter. Tr. 834. In that letter, Dr. Lager stated:

> [Wilson] is currently unable to work secondary to physical and emotional limitations post motor vehicle accident on July 29, 2013.
>
> There have been no changes in her disability status. She continues to experience physical pain and increased anxiety.
>
> She has been referred to Dr. Thomas Knox for pain management and physical rehabilitation. Per [Wilson], Dr. Knox has referred her to Dr. Jennifer Smail with Pledger Orthopedic and Spine Center for surgical evaluation.

Tr. 834.

*Dr. McIntyre*

In an undated "To Whom It May Concern" letter, Dr. McIntyre opined that Wilson's neck, arm, back and leg pain was the result of the July 29, 2013, automobile accident; MRI of the cervical and lumbar spine show displaced discs; and, considering the injury to Wilson's spine and the pain that she was experiencing, it was likely that Wilson would need treatment in the future. Tr. 950.

**b. Consultative examiners**

*Dr. Griffiths*

On January 11, 2014, Brian R. Griffiths, Psy.D., saw Wilson for a psychological evaluation. Tr. 534-541. Wilson complained of memory problems. Tr. 535, 540. Dr. Griffiths opined that there appeared to be some evidence to support a diagnosis of mild neurocognitive disorder due to head injury. Tr. 540. Dr. Griffiths indicated that Wilson's clinical presentation was somewhat suggestive of depression and there was ample evidence to support a diagnosis of unspecified depressive disorder. Tr. 540. Dr. Griffiths noted that Wilson reported symptoms

associated with PTSD and there was ample evidence to support a diagnosis of unspecified

anxiety disorder. Tr. 540. Dr. Griffiths offered the following functional assessment:

**Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**

[Wilson] performed within normal limits on Digit Span, a simple structured task assigned to assess short-term memory skills. However, she obtained WMS-IV IMI and DMI scores falling in the 9th and 7th percentiles, respectively. This information might indicate problems remembering and carrying basic work-related activities in a timely and consistent manner.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, maintaining persistence and pace, and performing both simple and multi-step tasks.**

[Wilson] was able to follow the conversation during the examination adequately. However, she was slow to perform serial sevens. It's possible that her emotional problems and neurocognitive dysfunction interfere with her ability to pay attention and concentrate, to some extent. In addition, the limited energy, easy fatigability and poor frustration tolerance that often accompany depression may interfere with task persistence and pace as well.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

[Wilson] was a polite and cooperative person. She displayed no indications of anger or hostility. However, she reported that her emotional problems cause [her] to withdraw. Her depression may interfere with her interpersonal functioning in the workplace. In addition, neurocognitive deficits like memory problems may further negatively impact her ability to effectively interact with coworkers, supervisors and the general public.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

[Wilson] gave a very brief description of her employment history. However, her comments did not suggest that she emotionally decompensates from exposure to the workplace. In light of her current mental state, the stress and pressures associated with day-to-day work activity might increase anxiety and decrease attention and concentration skills hampering decision-making abilities. Such stress might also lead to mental fatigue, mental confusion, and frustration producing unwanted responses in the workplace including crying, withdrawal, and slowed work performance.

Tr. 540.

### c.  Reviewing physicians/psychologists

*Physical*

On February 4, 2014, state agency reviewing physician Elizabeth Das, M.D., completed a Physical RFC Assessment.  Tr. 94-96.  Dr. Das opined that Wilson had the RFC to occasionally lift/carry 20 pounds; frequently lift/carry 20 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push/pull unlimitedly, except as indicated for lift/carry.  Tr. 94-95.  Dr. Das opined that Wilson had the following postural limitations: occasional climbing ramps/stairs, climbing ladders/ropes/scaffolds, balancing, stooping, and crouching; and frequent kneeling and crawling.  Tr. 95.  Dr. Das also opined that Wilson was limited to frequent reaching overhead on the right due to AC joint degeneration.  Tr. 95-96.

Upon reconsideration, on July 9, 2014, state agency reviewing physician Dimitri Teague, M.D., completed a Physical RFC Assessment.  Tr. 125-127.  Dr. Teague's RFC Assessment differed from Dr. Das' opinion in that Dr. Teague limited Wilson to 4 hours of standing/walking (Tr. 126), whereas, Dr. Das limited Wilson to 6 hours of standing/walking (Tr. 95).  Otherwise, the reviewing physicians' opinions were similar.

*Psychological*

On February 4, 2014, state agency reviewing psychologist Jennifer Swain, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 92-93) and Mental RFC Assessment (Tr. 96-98).  In the PRT, Dr. Swain opined that Wilson had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 93.  In the Mental RFC Assessment, Dr. Swain opined that

Wilson had some moderate understanding and memory limitations, stating that Wilson's vocabulary suggested low average intelligence and Wilson's reduced immediate and delayed memory suggested that Wilson would have difficulty remembering and carrying out detailed tasks. Tr. 96-97. Dr. Swain opined that Wilson had some moderate sustained concentration and persistence limitations, indicating that Wilson performed computations and serial sevens but did so slowly; Wilson reported depression and showed neurocognitive deficits which may interfere with task persistence and pace; and that Wilson would do best with simple tasks without time or production demands. Tr. 97. Dr. Swain opined that Wilson had some moderate social limitations, indicating that Wilson was cooperative during her psychological evaluation but her depression may cause her to withdraw and her neurocognitive problems reduce her interaction with coworkers and the public such that Wilson would do best with reduced interpersonal contact. Tr. 97-98. Dr. Swain opined that Wilson had some moderate adaptation limitations, indicating that Wilson had no history of decompensation but depression or neurocognitive changes could cause confusion but Wilson appeared capable of simple, routine tasks with changes that would be gradual and easily explained. Tr. 98.

Upon reconsideration, on July 16, 2014, state agency reviewing psychologist Karla Voyten completed a PRT (Tr. 123-124) and Mental RFC Assessment (Tr. 127-129). Dr. Voyten's conclusions regarding Wilson's limitations were similar to the opinions offered by Dr. Swain. Tr. 92-93, 96-98, 123-124, 127-129.

**C.     Testimonial evidence**[5]

**1.     Plaintiff's testimony**

---

[5] The November 18, 2015, hearing was conducted in Akron, Ohio. Tr. 78. The January 20, 2016, hearing was conducted via video conference. Tr. 38. The ALJ was located in Cleveland, Ohio. Tr. 38. Wilson and her attorney along with the hearing reporter operating the recording equipment were located in Akron, Ohio. Tr. 38. The vocational expert participated in the hearing via telephone. Tr. 38.

Wilson was represented at and testified at the hearings. Tr. 42-63, 82-84. Wilson's medical problems started following an automobile accident. Tr. 60. When asked why she was unable to work, Wilson indicated she has a hard time standing and sitting; she has severe anxiety around people and cries off and on; she has severe depression; she has issues with her neck, back, hips, and arms – she is in constant pain; and she has memory problems. Tr. 50-51. Wilson also has severe pain in her right shoulder and a hard time moving her arm. Tr. 63. Her doctors have indicated that the shoulder pain is coming from her neck and they have indicated she has neuropathy. Tr. 63. Wilson's family doctor was providing treatment for Wilson's mental conditions. Tr. 51. Wilson had called intake for a mental health appointment but had not heard back. Tr. 51, 52. Her family doctor had prescribed Cymbalta, which Wilson had been taking since her accident in July 2013. Tr. 51. Wilson indicated that the Cymbalta was prescribed for both her mental conditions and to treat her pain. Tr. 51. Other than seeing a therapist twice when she was being treated at Comprehensive Pain Management, Wilson has not attended counseling for her mental conditions. Tr. 51-52. She subsequently switched to the Spine and Pain Institute for her pain management treatment. Tr. 52. The Spine and Pain Institute was not treating Wilson for her depression. Tr. 52.

Wilson explained that she has pain throughout her whole back that radiates into her arms, right leg and neck. Tr. 58-59. She has headaches daily. Tr. 59.

Wilson's insurance company denied her doctor's request for an MRI because she had not had physical therapy. Tr. 52-53. When asked at the second hearing whether she was attending physical therapy, Wilson indicated she was not attending because she was in so much pain from her procedures and she was having a hard time remembering to call. Tr. 52-53. Before starting physical therapy, Wilson wanted to discuss the matter with her pain management doctor because

she had been having extreme pain since receiving an epidural injection in her neck. Tr. 54. She was scheduled to see her pain management doctor the day after the January 20, 2016, hearing. Tr. 54.

Following her accident in July 2013, Wilson's doctor prescribed a cane. Tr. 56-57. She generally uses her cane continuously. Tr. 57. Sometimes she is embarrassed to use a cane because of her age so at times she tries to go without using her cane but her balance is significantly off. Tr. 57. Once, she tried to stop using her cane but she had more problems and a therapist recommended that she continue to use her cane. Tr. 57.

Wilson explained that her pain management doctors counsel her regarding her pain; they prescribe medications; they administer facet, nerve block and epidural injections; and they have talked with her about doing some at home strengthening exercises for her arms, legs, neck and back. Tr. 55. Wilson did not feel that her pain medication helped on bad days, noting that she did not have anything to take for breakthrough pain. Tr. 61. Wilson reported receiving about 4-5 days relief after receiving the epidurals. Tr. 61. Wilson's first pain management doctor recommended surgery because her neck and back were so bad. Tr. 55-56. Wilson was scheduled for surgery but her ex-husband removed her from his insurance so she did not have the surgery. Tr. 56. Her current pain management doctors were considering surgery because the epidurals were not working. Tr. 56. Wilson acknowledged that there had been discussion about her seeing a chiropractor. Tr. 63. She had an appointment scheduled with the chiropractor but she had not yet seen him. Tr. 63.

Wilson had an MRI of her knee following an incident that occurred while she was vacationing in New Jersey with her sister in August 2015. Tr. 61, 62. When she was on vacation, a little girl was stuck in a riptide and Wilson was injured while attempting to help the

little girl.  Tr. 61-62.  She ended up with a very severe sprain.  Tr. 62.  Wilson indicated that the drive to New Jersey was about a 4½ - 5 hours.  Tr. 62.  She stated it was hard for her to ride in the car, indicating that they had to take breaks so she could get out and stretch.  Tr. 62.

Wilson explained that her bedroom was upstairs but she had not been sleeping there; since June of 2015, she had been sleeping on a reclining sofa.  Tr. 83.  Wilson has two cats and two Chihuahuas.  Tr. 43.  Wilson indicated that both she and Kevin take care of the animals.  Tr. 43.  Wilson has a driver's license and is able to drive.  Tr. 43.  She usually drives to the gas station and to doctor appointments.  Tr. 43.  Wilson estimated being able to be on her feet for about 5-10 minutes and she estimated being able to sit for about 30-40 minutes but she has to get up or shift her body due to pain.  Tr. 55.   A typical day for Wilson involves being in pain and confined to her couch recliner.  Tr. 56.  Sometimes, Wilson sleeps the day away in order to fight the pain.  Tr. 56.  She showers and uses the bathroom.  Tr. 56.  She enjoys being with her Chihuahuas, indicating that it helps her with her anxiety and depression.  Tr. 56.  Wilson's doctors have suggested that she try to do some things around the house such as taking the dogs out with her cane, doing dishes, and doing some light cooking.  Tr. 56.  Wilson has tried to engage in these activities but, if she needs to take a rest, she takes a rest and Kevin helps her.  Tr. 56.  She tries walking her dogs around the yard but indicated it was hard because they jerk her with the leash.  Tr. 59.  She has tried to do dishes but they have had to replace them because she drops them.  Tr. 60.  She can stand at the sink for about 5 minutes but then has to hold herself up to the sink and bend over the sink because of the pain in her back.  Tr. 60.

Wilson has some friends but she does not spend a lot of time with them because she is unable to deal with people.  Tr. 57.  There was a couple that she was friends with the prior summer and spent time with but they ended up stealing from her so she has a hard time trusting

people.  Tr. 57.  She has some Facebook friends but does not even really enjoy texting or talking on the phone.  Tr. 57.

### 2.    Vocational Expert

Vocational Expert ("VE") Gene Burkhammer testified at the hearing.  Tr. 64-74.  The VE described Wilson's past work to include work as: (1) night clerk auditor, a sedentary, SVP 5[6] position; (2) front desk clerk, a light, SVP 4 position; (3) head housekeeper, a light, SVP 8 position as generally performed but medium as performed by Wilson because she may have been working as a housekeeper; (4) retail cashier sales clerk, a light, SVP 3 position; and (5) fast food worker, a light, SVP 2 position.  Tr. 65-66.

The ALJ asked the VE to assume a hypothetical individual of Wilson's age and education and with the past jobs that the VE described who is limited as follows:

> This person can lift and carry occasionally 20 pounds, frequently 10 pounds; can sit, stand, and walk for up to six hours; can push and pull as much as they can lift and carry; can frequently operate hand controls bilaterally; can frequently reach overhead with the right and can frequently handle bilaterally.  This person can occasionally climb ramps and stairs, never ladders and scaffolds, can occasionally balance, occasionally stoop, frequently kneel, occasionally crouch, and frequently crawl.  This person can - - is limited to performing civil tasks, but not at production rate pace, meaning no assembly line work; can have - - this person could have frequent interaction with supervisors, coworkers, and the public, and can tolerate routine workplace changes.

Tr. 67.

The VE indicated that the described individual would be able to perform all of Wilson's past work with the exception of head housekeeper as performed by Wilson.  Tr. 67, 68.  The VE also indicated that there were other light jobs that the described individual could perform,

---

[6] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

including (1) housekeeping cleaner; (2) mail clerk; and (3) sales attendant. Tr. 68-69. The VE provided national job incidence data for each of the identified jobs. Tr. 68-69.

The ALJ then asked the VE to assume the first hypothetical but to reduce the standing and walking to 4 hours each. Tr. 69. With that modification, the VE indicated that the only past job that Wilson performed that the described individual could perform would be the night clerk auditor position. Tr. 69. The VE indicated that there were sedentary jobs that the described individual could perform, including (1) document specialist, an SVP 2 position; (2) receptionist, an SVP 3 position; and (3) food and beverage order clerk, an SVP 2 position. Tr. 69-70. The VE provided national job incidence data for each of the identified jobs. Tr. 70.

Next, the ALJ asked the VE to return to the first hypothetical and add that the individual is right-handed but uses a cane with her left hand for ambulation and station. Tr. 70. With that additional limitation, the ALJ inquired as to whether the described individual would be able to perform the past work that Wilson performed. Tr. 70. The VE indicated that he would exclude all light level jobs. Tr. 71. However, the VE indicated that all of the sedentary jobs identified in response to the sedentary hypothetical would remain available as well as the night clerk auditor. Tr. 70, 71. The ALJ then asked about an employer's tolerance for an employee being off task. Tr. 71. The VE responded that an employer's tolerance for time off task is 15% in an 8-hour day on an ongoing basis. Tr. 71-72.

Wilson's counsel inquired about the training requirements for an SVP 5 job. Tr. 72. The VE indicated that the minimum training requirement for an SVP 5 job is 6 months to a year. Tr. 72. Wilson's counsel then asked the VE to consider the ALJ's second hypothetical with the additional limitations of no more than occasional reaching in all directions and only frequent handling and fingering bilaterally. Tr. 73. In support of the additional limitations, Wilson's

counsel pointed to February 2014 nerve conduction study showing multi-level cervical radiculopathy. Tr. 73. The VE indicated that a limitation of occasional reaching would be an issue for sedentary or light level jobs so all work would be excluded based on the additional limitations noted. Tr. 73.

Wilson's counsel then asked the VE whether persistence and pace limitations resulting in an individual being late to work or leaving early or missing one day per week would affect the availability of jobs. Tr. 74. The VE indicated that missing one day per week would be excessive for most employers. Tr. 74. He indicated that employers would have a little more tolerance for being late or leaving early but not a full day per month. Tr. 74.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[7] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[8] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[9] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

# IV. The ALJ's Decision

In his February 16, 2016, decision, the ALJ made the following findings:[10]

1.  Wilson meets the insured status requirements of the Social Security Act through March 31, 2015.  Tr. 21.

2.  Wilson has not engaged in substantial gainful activity since July 29, 2013, the alleged onset date.  Tr. 132.

3.  Wilson has the following severe impairments: disorders of the spine with radiculopathy, medial compartment ligament sprain of the right knee, obesity, affective disorder and anxiety disorder.  Tr. 21.  Wilson also has the following non-severe impairment: asthma.  Tr. 21-22.

4.  Wilson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 22-24.

5.  Wilson has the RFC to perform light work, with lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, sit for 6 hours in an 8-hour day, stand and walk for 4 hours in an 8-hour day, push/pull as much as indicated for lift/carry; frequent bilateral hand controls; frequent reaching overhead with the right; frequent handling on the left and right; occasional climbing ramps and stairs but never ladders, ropes, or scaffolds; occasional balancing, stooping and crouching and frequent kneeling and crawling; limited to performing simple tasks but not at a production rate pace (e.g., assembly line work); frequent interaction with supervisors, coworkers, and the public; limited to routine workplace changes; and she is a right-handed individual who uses a cane with the left hand for ambulation and station.  Tr. 24-27.

6.  Wilson is capable of performing past relevant work as a night clerk auditor, as actually and as generally performed.  Tr. 27-28.

7.  Alternatively, the ALJ made the following Step Five findings:

    a.  Wilson was born in 1981 and was 31 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 28.

    b.  Wilson has a limited education and is able to communicate in English.  Tr. 28.

---

[10] The ALJ's findings are summarized.

     c.   Transferability of job skills is not material to the determination of disability.  Tr. 28.

     d.   Considering Wilson's age, education, work experience and RFC, there are other jobs that exist in significant numbers in the national economy that Wilson can perform, including document specialist, receptionist, and food and beverage order clerk.  Tr. 28-29.

Based on the foregoing, the ALJ determined Wilson had not been under a disability, as defined in the Social Security Act, from July 29, 2013, through the date of the decision.  Tr. 29.

## V. Plaintiff's Arguments

Wilson argues that the ALJ did not properly evaluate her credibility.  Doc. 15, pp. 20-21; Doc. 17, pp. 3-4.  Wilson also argues that at Step Four the ALJ improperly found that Wilson could return to her past job as a night clerk auditor (Doc. 15, pp. 15-20; Doc. 17, pp. 1-3) and that the ALJ did not meet his Step Five burden (Doc. 15, pp. 22-23; Doc. 17, pp. 4-5).

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err in assessing Wilson's credibility**

Wilson argues that the ALJ did not properly assess her credibility because the ALJ erred

in considering Nurse Hathaway's diagnosis of Munchausen.  Doc. 15, p. 21.  She argues that,

rather than viewing this diagnosis as an additional psychological impairment, the ALJ

erroneously relied on this diagnosis in his credibility determination.  Doc. 15, p. 21; Doc. 17, pp.

1-3.  Wilson also contends that the ALJ did not carefully consider the entirety of the record,

arguing that the ALJ selectively chose evidence that supported his conclusion that Wilson was

not entirely credible.  Doc. 15, p. 21; Doc. 17, p. 1.

Social Security Ruling 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing*

*the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-

7p")[11] and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an

individual's subjective statements about his or her symptoms.  First, the ALJ must determine

whether a claimant has a medically determinable physical or mental impairment that can

reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the

---

[11]  SSR 96-7p was in effect on March 14, 2016, the date of the ALJ's decision. SSR 16-3p, with an effective date of
March 28, 2016, supersedes SSR 96-7p.  2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24,
2016).

intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 96–7p.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Following a thorough discussion of the medical evidence, including evidence that Wilson points to in support of her claim that her impairments are completely disabling, the ALJ explained in detail the reasons for finding Wilson's statements concerning the intensity, persistence and limiting effects of her alleged symptoms not entirely credible. Tr. 25-26. The ALJ stated:

> Thus, after careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. As noted above, despite the claimant's pain complaints, physical examinations have consistently noted normal sensation, normal reflexes and normal muscle strength (Exhibits 12F,

32

p.12; 16F, p.9; 25F, pp. 4-5).  In addition, she was able to travel to New Jersey by car this summer for a beach vacation despite her complaints of pain.  Moreover, treatment notes from Kathleen Hathaway, CNP at Mercy Medical Center indicate that there are significant discrepancies between what the claimant told her and what is documented in the evidence.  She also noted that the claimant significantly exaggerated her list of diagnoses (Exhibit 28F, pp.4-5). Ms. Hathaway also diagnosed the claimant with Munchausen syndrome, which lessens the claimant's credibility (Exhibit 28F, pp. 4-5).  Furthermore, records from Thomas Knox, M.D. note that the claimant was prescribed Opana/Oxymorphone but laboratory studies indicate that it was not found in her system (Exhibit 12F, pp. 34, 37, 42). Records from Comprehensive Pain Management note that the claimant was discharged from her prior pain management physician and that it was likely due to her consistently being negative for high dose opioids on her toxicology reports (Exhibit 20F, p. 10). Finally, at her hearing, the claimant made several allegations regarding necessary treatment or diagnostic tests but when asked if she had the test or treatment, she always had an excuse as to why she had not.

Tr. 26.  As is clear, in finding Wilson's allegations not entirely credible, the ALJ considered more evidence than Nurse Hathaway's diagnosis of Munchausen syndrome.  For example, he considered Wilson's activities of daily living, including Wilson's ability to travel by car to New Jersey for a vacation notwithstanding her complaints of disabling pain.  The regulations make clear that daily activities and "other factors" concerning an individual's functional limitations are appropriate factors to consider when assessing an individual's credibility.  *See* 20 C.F.R. § 404.1529(c)(3)(i) and (vii); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (finding it appropriate for an ALJ to take into account evidence regarding claimant's other activities when assessing credibility, including going on vacation).  Additionally, the ALJ considered medical treatment notes that reflect normal objective medical findings.  Contrary to Wilson's claim, the ALJ did not fail to consider abnormal medical findings.  Tr. 25 (noting that examination revealed tenderness and limited range of motion).  Thus, the ALJ did carefully consider the evidence but concluded that the evidence did not fully support Wilson's allegations of completely disabling symptoms.  As indicated above, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn

the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *See Jones*, 336 F.3d at 477. Additionally, the ALJ considered that, while the record indicated diagnoses of unspecified depressive disorder and unspecified anxiety disorder, Wilson attended only two psychotherapy sessions and elected to stop treatment with Mr. Suarez. Tr. 26. The regulations make clear that it is appropriate to consider treatment, other than medication, received for relief of pain or other symptoms when assessing an individual's credibility. *See* 20 C.F.R. § 404.1529(c)(3)(v).

The ALJ's decision makes clear that the ALJ fully considered the record and assessed the credibility of Wilson's subjective statements and did not limit his credibility assessment to one piece of evidence. Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Wilson's impairments is supported by substantial evidence. Accordingly, reversal and remand is not warranted based on the ALJ's credibility assessment.

## C.    The ALJ's Step Five finding is supported by substantial evidence

Wilson argues that the ALJ erred at Step Five because the ALJ failed to incorporate all of Wilson's limitations into the various hypothetical questions presented to the VE. Doc. 15, pp. 22-23; Doc. 17, p. 4.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)

(citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Wilson argues that the ALJ did not accurately account for her hand limitations. Doc. 15, pp. 22-23; Doc. 17, p. 4. The ALJ included the following limitations in the RFC to account for upper extremity impairments – "frequent bilateral controls; frequent overhead reaching with the right; [and] frequent handling on the right and left." Tr. 24. Wilson contends that the ALJ should have included an additional limitation of only occasional reaching in all directions. Doc. 15, pp. 22-23; Doc. 17, p. 4. The Court finds no merit to Wilson's argument. The manipulative limitations included in the RFC are supported by the state agency reviewing physicians' physical RFC assessments. *See* Tr. 95-96, 127 (indicating that Wilson should be limited to frequent overhead reaching on the right). Wilson relies on her cervical MRI results and nerve conduction studies to argue that she had documented problems with her bilateral upper extremities and therefore the ALJ should have included more limited reaching instructions. However, the ALJ did not ignore this medical evidence. Tr. 25 (discussing both the cervical MRI and EMG and nerve conduction studies). Moreover, the ALJ provided additional manipulative limitations beyond those included in the state agency reviewers' physical RFC assessments due to Wilson's impairments and cervical radiculopathy. Tr. 27 (explaining further manipulative limitations of only frequent hand controls and frequent handling on the right and left). An ALJ need only include those limitations that the ALJ finds credible. Here, Wilson proposes limitations beyond those that the ALJ found supported by the evidence. The Court finds the ALJ sufficiently explained the manipulative limitations included in the RFC and corresponding VE hypothetical relied upon by the ALJ and finds that those limitations are supported by substantial evidence.

In a rather undeveloped argument, Wilson appears to contend that the ALJ should have added a limitation in the RFC regarding absences from work; namely, that Wilson would miss one day of work per week. Doc. 15, p. 22. While Wilson's counsel posed a hypothetical question to the VE concerning this limitation, as noted above, the ALJ thoroughly considered the evidence of record and Wilson has not demonstrated that it was error for the ALJ not to include such a limitation in the RFC.

In response to hypothetical questions incorporating the RFC limitations (Tr. 67-71), the VE indicated that there would be sedentary jobs available to the described individual (Tr. 69-70, 71). Specifically, the VE identified the following three jobs: document specialist, a sedentary, SVP 2 job; receptionist, a sedentary, SVP 3 job; and food and beverage order clerk, a sedentary, SVP 2 job. Tr. 69-70, 71. The ALJ properly relied on this testimony to support his Step Five finding.

The Court notes that, in a cursory fashion, Wilson takes issue with two discrepancies between the initial VE hypothetical and the RFC. Doc. 15, p. 18. She argues that the initial VE hypothetical describes someone capable of light work but the RFC limitation of needing a cane to ambulate limits her to sedentary work and she argues that the VE hypothetical describes an individual limited to performing "*civil*" tasks whereas the RFC limits her to performing "*simple*" tasks. Doc. 15, p. 18. With respect to the light versus sedentary limitation, as is clear from later modifications to the initial VE hypothetical, the VE made clear that there would be sedentary jobs available to someone who is right-handed and uses a cane in her left hand to ambulate. Tr. 70, 71. Further, when read in context, the Court finds that the reference to "civil" as opposed to "simple" tasks in the administrative hearing transcript is likely a transcription error and/or the ALJ intended to state "simple" tasks. *See e.g.*, *Quaite v. Barnhart*, 312 F.Supp.2d 1195, 1199-

1200 (N.D. Ohio 2004) (finding a typographical or clerical error in ALJ decision was not a basis for reversal). For example, after indicating the type of tasks that the individual can perform, in both the RFC and relevant portion of the hearing transcript, the ALJ explains that the tasks may not be at a production rate pace, meaning no assembly line work. Tr. 24, 67. Alternatively, the Court finds that remand for the purpose of clarifying the meaning of "civil" tasks or to ask a hypothetical substituting the word "simple" for "civil" would be futile. Two out of the three jobs that the VE identified in response to the hypothetical questions that otherwise mirrored the RFC were unskilled, sedentary jobs (Tr. 69-70) and Wilson has not argued or demonstrated that those jobs would not be available to an individual limited to "simple" tasks. *See e.g., Farrell v. Comm'r of Soc. Sec.*, 2016 WL 316724, * 7 (W.D. Mich. Jan 27, 2016) (finding ALJ's failure to include certain postural limitations that were part of the RFC into the hypothetical to the VE amounted to harmless error and reversal was not warranted because the jobs identified by the VE did not require the postural abilities that the ALJ found the claimant was limited in doing).

Considering the foregoing, the Court finds that the ALJ's Step Five finding is supported by substantial evidence and there is no basis upon which to reverse and remand the Commissioner's decision based on the Step Five finding.

## D. Wilson's Step Four argument

In addition to asserting error at Step Five, Wilson argues that the ALJ erred at Step Four when he concluded that Wilson was capable of performing her past work as night clerk auditor because the RFC limits Wilson to simple tasks yet the night clerk auditor position is a skilled job. Doc. 15, pp. 15-20; Doc. 17, pp. 3-4. Also, she argues that the VE testified that the Hampton Inn job was a composite job, consisting of both the night clerk auditor and front desk clerk and,

since the front desk clerk job is a light job, that portion of the composite position could not be performed by Wilson based on the limitations in the RFC. Doc. 15, pp. 15-20; Doc. 17, pp. 3-4.

As discussed above, at Step Five, the ALJ alternatively found that there were jobs that existed in significant numbers that Wilson could perform. And, as discussed above, the Court has determined that the ALJ's Step Five determination is supported by substantial evidence. Thus, it is not necessary for the Court to address Wilson's Step Four argument.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: April 3, 2018

_____
Kathleen B. Burke
United States Magistrate Judge